# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BLACK, Minors.

UNPUBLISHED
April 26, 2018

Nos. 340745; 340941
Wayne Circuit Court
Family Division
LC No. 16-522700-NA

Before: BORRELLO, P.J., and SHAPIRO and TUKEL, JJ.

PER CURIAM.

In Docket No. 340745, respondent-mother appeals as of right the order terminating her parental rights to the minor children, AFB, DMB, JDB, TDB, ZMB I, and ZMB II, pursuant to MCL 712A.19b(3)(a)(*i*) (the child has been deserted for 28 or more days and the child's parent is unidentifiable and has not sought custody), (a)(*ii*) (the child has been deserted for 91 or more days and the parent has not sought custody), (c)(*i*) (the conditions that led to the adjudication continue exist), (g) (the parent fails to provide proper care or custody), and (j) (reasonable likelihood that the child will be harmed if returned to parent's home).

In Docket No. 340941, respondent-father appeals as of right the same order, terminating his parental rights to two of the children, ZMB I and ZMB II, pursuant to MCL 712A.19b(3)(a)(*i*) (the child has been deserted for 28 or more days and the child's parent is unidentifiable and has not sought custody), (a)(*ii*) (the child has been deserted for 91 or more days and the parent has not sought custody), (c)(*i*) (the conditions that led to the adjudication continue exist), (g) (the parent fails to provide proper care or custody), (h) (parent is in prison for more than 2 years and has not provided proper care and custody), and (j) (reasonable likelihood that the child will be harmed if returned to parent's home).[1]

---

[1] Although not challenged on appeal, the written order of termination omits section (h) as a ground for termination of respondent-father's parental rights, even though that ground was cited in the amended petition and in the court's conclusions on the record as a basis for terminating respondent-father's parental rights. The omission was a harmless clerical error. Additionally, petitioner agrees that MCL 712A.19b(a)(*i*) does not apply to respondent-mother or respondent-father, but was applicable to the unknown fathers of the children.

In these consolidated appeals, respondents challenge the trial court's conclusions that there were statutory grounds for terminating their parental rights and challenge the trial court's best-interest determination. We affirm.

## I. STANDARD OF REVIEW

This Court reviews orders terminating parental rights for clear error. *In re JK*, 468 Mich 202, 209; 661 NW2d 216 (2003). "Clear error signifies a decision that strikes us as more than just maybe or probably wrong." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009). Clear error exists "if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004). This Court also reviews for clear error the trial court's decision regarding the children's best interests. *In re Olive/Metts*, 297 Mich App 35, 40-41; 823 NW2d 144 (2012). A best-interest determination must be supported by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).

Respondent-father did not argue that terminating his parental rights was premature because he had not been provided with a treatment plan. Therefore, this claim is unpreserved. Unpreserved issues are reviewed for plain error affecting substantial rights. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008).

## II. STATUTORY GROUNDS AND REASONABLE EFFORTS

There was sufficient evidence to support at least one statutory ground for terminating both respondents' parental rights. Before terminating a respondent's parental rights, the trial court must make a finding that at least one of the statutory grounds under MCL 712A.19b(3) has been established by clear and convincing evidence. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010).

The trial court relied on MCL 712A.19b(3)(a)(*ii*), (c)(*i*), (g), (h), and (j). These statutory grounds provide:

(3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

(a) The child has been deserted under either of the following circumstances:

\* \* \*

(*ii*) The child's parent has deserted the child for 91 or more days and has not sought custody of the child during that period.

\* \* \*

-2-

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . :

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

(h) The parent is in prison for such a period that the child will be deprived of a normal home for a period exceeding two years and the parent has not provided for the child's proper care and custody, and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The evidence met the clear and convincing evidentiary standard required to terminate respondent-mother's parental rights pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j). On May 4, 2016, the children were removed from respondent-mother's care because of severe physical and medical neglect. Respondent-mother and the children were living in a house without working utilities, furnishings, food, water, or sustenance of any kind. The children were malnourished, dehydrated, inadequately clothed, and dirty. Three of the children were hospitalized and treated for failure to thrive. Respondent-mother reportedly was diagnosed with Bipolar Disorder and was not receiving treatment. Respondent-father was incarcerated. TDB was placed with the maternal grandmother and the other children were placed in non-relative foster care.

On July 21, 2016, respondent-mother was ordered to comply with and benefit from a parent-agency treatment plan. Under the plan, respondent-mother agreed to attend all court hearings, maintain contact with her case workers and attorney, attend weekly parenting time, participate in parenting classes, and attend the children's medical appointments. She also agreed to attend individual counseling, medication reviews, a psychological evaluation, and a psychiatric evaluation, if recommended, and to follow all of the evaluators' recommendations. Additionally, respondent was to obtain and maintain suitable housing, earn a GED, and establish and maintain a legal income source.

The proofs clearly showed that respondent-mother did not comply with her treatment plan, which was designed for her to achieve emotional and financial stability and foster a healthy parenting relationship with her children. In September 2016, she was referred for, but did not complete, a psychological evaluation. Respondent-mother did not consistently participate in individual counseling and was terminated from services at Northeast Guidance Center and Total Wellness Center. She was referred to parenting programs three times. Respondent-mother attended a total of nine sessions and failed to complete the program. She provided mental health prescription medication documentation only once in 2016. During the entire proceeding, respondent-mother was living in the basement of her relatives' home and had not taken any steps to acquire suitable independent housing and financial stability. Respondent-mother initially reported that she received social security benefits but later said that her benefits were disallowed. She did not timely reapply for benefits. Respondent-mother did not maintain regular contact with her children or service providers and was absent from nearly all court hearings. Thus, the trial court did not clearly err by finding that conditions that led to the adjudication continued to exist despite 14 months of services that were offered to reunite respondent-mother with her children. The trial court reasonably concluded that the family reunification barriers would not be rectified within a reasonable time considering her children's young ages. See MCL 712A.19b(3)(c)(*i*).

The record similarly supports the trial court's findings of statutory grounds pursuant to MCL 712A.19b(3)(g) and (j). For 14 months, respondent-mother made virtually no progress in her treatment plan which was evidence of continued neglect. See *In re Trejo*, 462 Mich 341, 361; 612 NW2d 407 (2000), abrogated in part by statute on other grounds as stated in *In re Moss*, 301 Mich App at 83. Given respondent-mother's noncompliance with her service plan and her lack of progress in addressing her mental illnesses, the evidence supported the conclusion that there was no reasonable expectation that respondent-mother would be able to properly care for her children in a reasonable time considering their ages. Respondent-mother made no serious effort in addressing her mental health and financial issues that had gravely harmed her children. Her inability to meet her children's most basic needs remained unchanged for 16 months. Therefore, the trial court also reasonably concluded that the children would be harmed if they were returned to respondent-mother's custody and care.

Respondent-mother relies heavily on the Michigan Supreme Court's recent decision in *In re Hicks*, 500 Mich 79; 893 NW2d 637 (2017). The *In re Hicks* Court held that the petitioner's obligation to provide services is subject to the requirements of the ADA, *In re Terry*, 240 Mich App 14, 25-26; 610 NW2d 563 (2000), which provides that "'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *In re Hicks*, 500 Mich at 86, quoting 42 USC 12132. Accordingly, DHHS is required to make reasonable modifications to its service plan to avoid discrimination on the basis of disability. *In re Hicks*, 500 Mich at 86. Where DHHS fails to modify its service plan to accommodate a disability under the ADA, DHHS has failed to make reasonable efforts toward reunification. *Id*.

Respondent-mother contends that caseworkers knew that she was suffering from a psychiatrically diagnosed depression and that she was illiterate and most likely developmentally disabled. She claims that caseworkers did not accommodate her reluctance to take a bus, which

-4-

was caused by depression, and never referred her to educational classes or helped her obtain employment. Respondent-mother argues that she never abused her children and any deficiencies suffered by her children were clearly a result of her untreated disabilities. We disagree.

The facts in this case are readily distinguishable from those in *In re Hicks*. As noted in that decision, a petitioner cannot accommodate a disability of which it is unaware. *Id.* at 87. The petitioner in *In re Hicks* had full knowledge of respondent's disabilities because she had participated in functional and psychological assessments that established her cognitive defects, including an IQ of 70, within borderline of intellectual function. *Id*. at 87 n 5. Moreover, in *In re Hicks*, the petitioner had failed to provide the court-ordered services recommended by medical professionals, which were specifically tailored to accommodate her disability. *Id*. at 89-90. In this case, the trial court properly concluded that there was no evidence in the record that supported respondent-mother's claim that she was entitled to accommodations in her service plan. Respondent-mother self-reported that she received special education services during her school career and that she dropped out after the 9th grade. She also stated that, according to her aunt, she was diagnosed with mental illness as a child, but had never received any treatment or was told a specific diagnosis. Respondent-mother also reported that she suffered from depression and was scheduled for an evaluation on June 28, 2016. She provided one prescription for Lexapro, a medication for depression. At the July 2016 disposition, the trial court ordered petitioner to provide mental health services. In response to respondent-mother's assertion that she had a learning disability, she was directed to sign medical releases for any provider who had diagnosed or treated her for a learning disability. Further, the trial court instructed caseworkers to include testing for any delays when referring respondent-mother for a psychological evaluation and to provide all accommodations, if medically necessary. Respondent-mother failed to follow up with a psychological evaluation referral in September 2016. The caseworker had requested mental health care information, but none was received.

Respondent-mother initially reported that she was receiving social security benefits, but then told caseworkers that she was denied benefits. In July 2016, the court encouraged respondent-mother to apply for social security benefits. In May 2017, she reportedly had filed for social security disability benefits. Respondent-mother did not attend the September 2017 termination hearing because she claimed that she had to attend a social security hearing that could not be adjourned. She did not provide documentation to her attorney or the court that supported the reason for her absence. Although respondent-mother's attorney repeatedly asserted respondent-mother's limitations at the disposition, periodic reviews, and the termination hearings, respondent-mother never provided any evidence to show that her mental and intellectual issues fell within the definition of a disability under the ADA.

Nonetheless, the record shows that petitioner made reasonable accommodations for respondent-mother's claimed limitations. On appeal, respondent-mother highlights the testimony of Anita Pace, the foster care supervisor assigned to the case at its inception, at the termination hearing and ignores additional evidence in a lengthy record. Child protective proceedings are a single continuous action. *In re LaFlure*, 48 Mich App 377, 391; 210 NW2d 482 (1973). "Therefore, evidence admitted at any one hearing is to be considered evidence in all subsequent hearings." *Id*. Pace had limited knowledge of the case. Although she was the assigned foster care supervisor when the case began, at some point she was no longer involved with the case until it was reassigned to her in April 2017. Evidence admitted at earlier hearings

showed that respondent-mother was referred for an evaluation and individual counseling to address her mental health issues. She was personally given bus tickets so that she would participate in treatment. Respondent-mother told caseworkers that she did not participate in services because she had anxiety about riding a bus, even though she said that she rode a bus to other places. She did not participate in offered home-based family services. She was assigned a parent partner in November 2016. Respondent-mother told the parent partner that she could not seek employment because of anxiety. The parent partner offered to help her find employment, obtain Section 8 housing, obtain DHHS disability, and obtain social security disability benefits. Parent-partner services were terminated on March 1, 2017, because respondent-mother repeatedly did not return phone calls, was unavailable for in-home assistance, and did not make any progress. In April 2017, she was provided with intensive home-based mental health therapy. She repeatedly cancelled appointments. Nothing in the record suggests that respondent-mother's purported illiteracy was a barrier to understanding and complying with her treatment plan. Caseworkers spoke with respondent-mother in person and on the phone and did not rely on written communication. In the 16 months that the children were in foster care, respondent-mother visited only one time in June 2016. She wept the entire time and left after one hour. Respondent-mother refused to be driven by a caseworker and a relative to and from her home to parenting time. Respondent-mother did not attend parenting time even after her children were transported from various locations to one central meeting place within walking distance of her residence.

The trial court did not clearly err by concluding that *In re Hicks* was inapplicable. The trial court noted that services had been provided to deal with respondent-mother's diagnosed depression. The court concluded that depression was not an exceptional disability and that appropriate support mechanisms had been set into place, including a referral for a psychiatric evaluation and individual counseling. Additionally, respondent-mother's bus phobia was taken into account by moving the children closer to her residence and yet respondent-mother did not attend visits. The court stated:

> At some point or another it—you know, some cases get to be a much finer line between whether or not [*In re Hicks*] is applicable, due to the special needs of a parent. And other times there are just parents that are being provided with services, who are not taking advantage of them. And that is what we have here. So I don't think that Mother would—had any greater needs than any other parent, or that any—anything above and beyond what was offered to her, would've been required. And there's been no demonstration of this Record. There's been no evidence, on this Record, to show that mother had any greater needs, or any needs that could not of been met by her completing the parenting classes; by her completing either one of the individual therapies she was referred to; or even, simply, visiting her children to some degree or another.

Accordingly, we are not left with a definite and firm conviction that the trial court made a mistake in finding that at least one statutory ground to terminate respondent-mother's parental rights to the children was proven by clear and convincing evidence.

Likewise, with regard to respondent-father, we hold that the trial court did not clearly err by finding that at least one statutory ground existed to terminate respondent-father's parental

rights to ZMB I and ZMB II. The evidence met the clear and convincing evidentiary standard required to terminate respondent-father's parental rights pursuant to MCL 712A.19b(3)(a)(*ii*), (h), and (g).

The record shows that respondent-father did not provide his children with any support or care. Respondent-father was named as ZMB I and ZMB II's putative father at the time they were removed from respondent-mother's custody and care in May 2016. Respondent-father had been incarcerated since March 15, 2012, with an early release date in 2023. Respondent-father received notice of the initial removal petition and court hearings in 2016 and told the court that ZMB I and ZMB II were his children, although paternity had not been legally established. Respondent-father informed the court that he did not pay any support for the children because of his incarceration. Further, respondent-father made no provisions, including providing possible placement with relatives, for ZMB I and ZMB II after they were removed from respondent-mother's care in May 2016. At the May 12, 2016 preliminary hearing, he was ordered to submit to DNA testing at petitioner's expense. The court advised respondent-father that he had no legal standing until he established paternity. Respondent-father and the children participated in DNA testing in July and August 2016. On June 21, 2017, petitioner filed a supplemental petition to terminate ZMB I and ZMB II's father's parental rights, including those of respondent-father who had yet to acknowledge or establish paternity. More than 12 months after receiving notice of the initial petition, respondent-father's paternity was established on June 28, 2017, based on DNA testing and respondent-mother's and respondent-father's testimony. Respondent-father was then represented by court-appointed counsel and attended the termination hearing by speakerphone.

The record clearly shows that respondent-father never provided any custody or care for his children. The undisputed facts supported that trial court's findings under MCL 712A.19b(3)(a)(*ii*), (h), and (g). Respondent-father's earliest prison release date was 2023. In addition to not timely establishing paternity, respondent-father had been asked, but never provided the names of any relatives who were willing to permanently plan for his children, either before or during the termination hearing. On June 12, 2017, Pace sent a letter to respondent-father asking if he knew of any relatives who would be willing to permanently plan for his children. Thus, the trial court did not clearly err by concluding that there was no reasonable expectation that respondent-father would be able to provide proper care and custody within a reasonable time considering the children's young age. See MCL 712A.19b(3)(g).

Respondent-father claims error requiring reversal occurred because he was never provided with a treatment plan. This claim is groundless. The initial petition's goal of reunification never applied to respondent-father because, as a putative father, he was not considered a parent under MCR 3.903(A) and not entitled to an agency's services until he perfected paternity. *In re LE*, 278 Mich App 1, 18-19; 747 NW2d 883 (2008). Petitioner's amended petition sought to immediately terminate respondent-father's parental rights, which was permissible under MCR 3.977(E)(1). See also MCL 712A.19b(4). Petitioner is not required to provide reunification services when termination of parental rights is the agency's goal. *In re HRC*, 286 Mich App 444, 463; 781 NW2d 105 (2009). Petitioner was not required to provide respondent-father with a treatment plan because the goal of the proceedings at the time respondent-father established paternity was termination, rather than family reunification. See *In re LE*, 278 Mich App at 18-19, 21.

### III. BEST-INTERESTS DETERMINATION

The trial court also did not clearly err in finding that terminating respondents' parental rights was in the children's best interests. A trial court may consider evidence on the whole record in making its best-interests determination. *In re Trejo*, 462 Mich at 356-357. The trial court's findings need not be extensive; "brief, definite, and pertinent findings and conclusions on contested matters are sufficient." MCR 3.977(I)(1). The trial court may consider various factors, in addition to the child's bond to the parent, *In re BZ*, 264 Mich App at 301, including the parent's parenting ability, *In re Jones*, 286 Mich App 126, 129-130; 777 NW2d 728 (2009), the child's need for permanency, stability and finality," *In re Gillespie*, 197 Mich App 440, 446-447; 496 NW2d 309 (1992), and the advantages of a foster home over the parent's home, *In re Foster*, 285 Mich App 630, 634; 776 NW2d 415 (2009).

Respondent-mother argues that it was in the children's best interests to have a chance of a future relationship with her, which would have been possible if petitioner had accommodated her disabilities and thereby enabled her to comply with a parent-agency agreement. This argument is meritless, as stated above. Additionally, there was ample evidence to support the trial court's best-interest determination, the most telling of which was respondent's lack of contact with her children for 15 months. The trial court reasonably concluded that respondent's bond with her children was so tenuous that the younger children likely did not even remember her because of her lengthy absence.

The trial court also did not clearly err by determining that it was in the children's best interests to terminate respondent-father's parental rights. At the preliminary hearing, respondent-father verbally acknowledged that ZMB I and ZMB II were his children. Respondent-father was an absent father. Nothing in the record indicates that he had a bond with his children or took any steps to provide them with basic support or care. Contrary to respondent-father's argument that maintaining his parental rights was more desirable than the uncertainty of the adoption system, the foster caregiver, who had provided the children with a safe and stable home since May 2016, desired to provide them with needed permanency thorough adoption.

The caseworker opined that it was in the children's best interests to terminate both respondents' parental rights because the children needed stability and permanency. All of the children, except JDB, thrived while in the foster care and the foster parents desired to adopt them. Even with a proven disability, if a parent cannot or will not meet her irreducible minimum parental responsibilities, the needs of the child must prevail over the needs of the parent. *In re Terry*, 240 Mich App at 28. The record clearly showed that the children needed the continuity, certainty, and permanency that only adoption could bring.

Affirmed.

/s/ Stephen L. Borrello
/s/ Douglas B. Shapiro
/s/ Jonathan Tukel